James C. Shah (SBN 260435)
Email: jcshah@millershah.com
Kolin C. Tang (SBN 279834)
Email: kctang@millershah.com
**MILLER SHAH LLP**
19712 MacArthur Blvd., Suite 222
Irvine, California 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367

Christopher E. Roberts (phv forthcoming)
Email: CRoberts@butschroberts.com
BUTSCH ROBERTS & ASSOCIATES LLC
7777 Bonhomme Avenue, Suite 1300
Clayton, Missouri 63105
Telephone: (314) 863-5700

Max S. Morgan (phv forthcoming)
Email: max.morgan@theweitzfirm.com
THE WEITZ FIRM, LLC
1515 Market Street #1100
Philadelphia, PA 19102
Telephone: (267) 587-6240

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| KIMBERLY STARLING, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FARMERS INSURANCE EXCHANGE, FARMERS INSURANCE COMPANY, INC., and FIRE INSURANCE EXCHANGE,<br><br>Defendants. | Case No.: 2:24-cv-08644<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# CLASS ACTION COMPLAINT

COME NOW Plaintiff, Kimberly Starling ("Plaintiff" or "Starling"), individually, and on behalf of all others similarly situated, through her undersigned counsel, and for her Class Action Complaint against Defendants, Farmers Insurance Exchange, Farmers Insurance Company, Inc. and Fire Insurance Exchange (collectively, "Defendants" or "Farmers"), states as follows:

## INTRODUCTION AND BACKGROUND ON THE TCPA

1. Plaintiff brings this case to protect her privacy rights; namely, the right to be left alone from unwanted telemarketing phone calls.

2. Plaintiff brings this suit in an effort to stop telemarketers like Farmers from calling her and putative class (defined below) members' phones despite the fact that Plaintiff and the putative class members registered their phone numbers on the National Do-Not-Call Registry ("DNC List").

3. In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the Telephone Consumer Protection Act ("TCPA") into law, to protect consumers' privacy rights; namely, the right to be left alone from unwanted telemarketing calls. A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

4. The TCPA affords protections for people who registered their phone numbers on the DNC List. Specifically, the TCPA provides that each person who receives more than one call on their phone after being registered on the DNC List is entitled to recover a penalty of up to $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated. *See* 47 U.S.C. § 227(b)(1)(A); 47 U.S.C. § 227(b)(1)(3); 47 C.F.R. § 64.1200(a).

5. Since 2003, persons who register their cell phone numbers on the DNC List are considered "residential subscribers" for the purpose of 227(c)(5) and the DNC List. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of*

*1991*, 18 F.C.C. Rcd. 14014, 14039 (2003) ("we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'")

6. From January 2024 through September 2024, approximately 38.8 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com/history/time (last visited October 2, 2024).

7. Decades after the TCPA passed into law, it is still unfortunately the case that "month after month, unwanted telemarketing calls and texts top the list of consumer complaints received by the [Federal Communications] Commission." *Omnibus TCPA Order*, 30 FCC Rcd. 7961, 7964 (F.C.C. July 10, 2015).

8. In fact, in 2023 alone, there were more than two million do-not-call complaints to the FTC about unwanted telemarketing calls. Federal Trade Commission ("FTC"), *FTC Issues Biennial Report to Congress on the National Do Not Call Registry* (Jan. 8, 2024) *available at*: https://www.ftc.gov/news-events/news/press-releases/2024/01/ftc-issues-biennial-report-congress-national-do-not-call-registry (last visited October 4, 2024).

9. The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission ("FCC") levied more than $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this Court original jurisdiction of all civil actions arising under the laws of the United States.

11. This Court has personal jurisdiction over Defendants because they are

headquartered in California, transact business in California, and sell various insurance-related products and services in California.

12. Starling was (and is) a resident and citizen of the State of Texas at all times relevant to this Complaint.

13. Venue is proper under 28 U.S.C. §§ 1391(b)(2) as a substantial portion of the events giving rise to the claims herein arose in this District.

## PARTIES

14. At all times relevant to this Complaint, Starling was, and is still, the owner of a cell phone. Her cell phone number is 817-XXX-6140.

15. Starling registered her phone number on the DNC List on or about December 31, 2004, to avoid receiving unwanted telemarketing text messages.

16. The monthly bill associated with Starling's phone number is issued in her name, and not in the name of a business.

17. Starling uses her cell phone primarily for residential purposes, such as communicating with friends and family members.

18. Defendants, Farmers Insurance Exchange and Fire Insurance Exchange, are separate inter-insurance exchanges existing under the laws of California, with their principal places of business in California.

19. Defendants, Farmers Insurance Exchange and Fire Insurance Exchange, are authorized to conduct business in California and throughout the United States, and which market and sell various insurance products in California and throughout the United States.

20. Defendant, Farmers Insurance Company, Inc., is an insurance company authorized to conduct business in California and throughout the United States, and which markets and sells various insurance products throughout the United States.

21. Defendants are part of the Farmers Insurance Group, an insurance organization consisting of more than 20 insurance entities, with its principal place of business in California.

22. Farmers' primary business is selling insurance products and services, including, but not limited to, automobile and homeowners' insurance.

23. Farmers markets their insurance products through a variety of marketing tactics, including sending telemarketing text messages.

24. Starling did not provide any form of consent to Defendants to contact her on her cell phone.

## FARMERS' CAPTIVE AGENTS AND
## FARMERS' CONTROL OF THEIR CAPTIVE AGENTS' MARKETING

25. Defendants have agents throughout the United States who market and sell their insurance products.

26. Farmers' insurance agents are captive agents, meaning they are only permitted to sell Farmers' insurance products and cannot sell insurance products that compete with Farmers' insurance products.

27. When a person sends a telemarketing text message concerning the sale of a Farmers insurance policy, that telemarketer is authorized by Farmers to sell only a Farmers' policy of insurance, and no other company's policy of insurance. In other words, a telemarketer sending a text message or placing a call to sell a Farmers' insurance policy would only be texting or calling to sell a Farmers' insurance policy, and no other insurance company's policies of insurance.

28. On information and belief, Defendants retain the unilateral and absolute right to control the use of their agents' marketing, including, but not limited to, requiring approval before using Farmers' name or logo.

29. On information and belief, any advertising or marketing method to be used by a Farmers' agent is subject to the approval of Farmers.

30. On information and belief, Farmers' approval of marketing, including the use of the name Farmers, extends to telemarketing.

31. On information and belief, Defendants approved of the text messages placed to Starling and the texts and calls placed to the putative class members as

CLASS ACTION COMPLAINT                                                - 4 -

described in this Complaint.

32. On information and belief, Defendants control the geographic scope in which their agents may sell their products, and for which these agents may receive commissions.

33. On information and belief, Farmers retains the right to instruct their agents to not submit applications for insurance that were obtained from persons whose phone numbers were on the DNC List at the time they were texted or called by Farmers' agents. Furthermore, Defendants have the right to refuse to sell their insurance products to such persons.

34. On information and belief, after their agents contacted persons on the DNC List as described in this Complaint, Farmers sold insurance products to a number of those persons and received premiums from those sales.

35. On information and belief, Farmers at times pays for the marketing efforts of their captive agents.

36. Farmers underwrites the insurance policies marketed by their agents and guarantees the policies.

37. When an agent sells a Farmers' insurance policy to a consumer, the premium is paid directly to Farmers. The agent that sold the policy then receives a commission, which is paid by Farmers to the agent.

## FARMERS' TEXT MESSAGES TO PLAINTIFF

38. Despite not applying for or requesting insurance from Defendants, Starling began receiving solicitation text messages from Defendants.

39. Starling did not provide any form of consent to Defendants or anyone acting on their behalf to contact her, and was also not in the market for, or interested in, Defendants' insurance products.

40. Yet, on June 3, 2023, at approximately 11:06 a.m., Plaintiff received a solicitation text message on her cell phone from Defendants. The phone number that appeared on her cell phone was 214-915-2713 and the text message stated as follows:

> Hi Kimberly, This is Matthew at Todd Henderson Insurance Agency, Inc. I am reaching out before your home insurance renews to try and get you better coverage and save you money. Would you prefer that I text or email your quote to you?
>
> Text STOP to stop texts from this agency, or STOPALL to stop all texts & calls from Farmers.

41. One of Defendants' webpages, https://www.farmers.com/farmers-quote-texts/, like the text message to Starling, states, "Reply **STOP** to receiving SMS messages and no longer participate in the Farmers quote program or **STOPALL** to opt-out of all Farmers [sic] marketing SMS messages."

42. On June 13, 2023, at approximately 4:25 p.m., Starling received a text message on her cell phone from Defendants. The phone number that appeared on her cell phone was 214-915-2713 and was in the same text message chain as the previous text message she had received. The text message stated:

> Hello Kimberly, I'm Matthew, a local Farmers Agent. I am interested in earning your business and working for you. I'll contact you soon about your Home Insurance renewal. In the meantime I can get a head [sic] start on your quote. Just text back "yes." If you're not interested in my assistance, text back "stop."

43. On June 18, 2023, at approximately 4:30 p.m., Plaintiff received a text message on her cell phone from Defendants. The phone number that appeared on her cell phone was 214-915-2713 and was in the same text message chain as the previous text message. The text message stated:

> Hi Kimberly, it's Matt. Let's talk home insurance renewal rates. Happy with the current rate? If not, I'd love a chance to earn your business. Text or email for your quote?

44. Todd Henderson's ("Mr. Henderson") e-mail address is rhenderson2@farmersagent.com. Mr. Henderson's e-mail signature block states, "Todd Henderson Farmers Insurance" and includes Defendants' logo.

45. Defendants' website includes a profile for their captive agent, Todd

Henderson. The web address for this page is https://agents.farmers.com/tx/flower-mound/rtodd-henderson/.

46. Defendants' webpage for Mr. Henderson includes Defendants' logo and describes Mr. Henderson as a "Farmers Insurance Agent in Flower Mound, Texas" who has the "knowledge and experience to help you better understand your coverage options – whether that's auto, home, renters, business insurance and more."

47. Mr. Henderson's profile webpage also states that he is "your local Farmers® agent in Flower Mound, Texas."

48. Mr. Henderson's profile page also includes a blue button labeled, "Make an Appointment." Upon clicking the button, the user can request an appointment after providing information and answering various questions. One of the questions asks, "Already a Farmers customer?" Another option asks the user to check the box of "Farmers products that I am interested in discussing."

49. The disclaimer included before the option to send the appointment request states, "We sometimes reach out to consumers by call and/or text to provide helpful information about products or services. By clicking 'Submit' you consent to marketing calls and/or texts made to you on behalf of my agency or Farmers® Insurance entities . . . ."

50. Mr. Henderson's LinkedIn profile states, "R. Todd Henderson Farmers Insurance" and "Farmers Insurance Agency in Flower Mound, Texas."

51. Notably, Starling never provided Defendants, nor Mr. Henderson, any form of consent to contact her on her cell phone via text message or by any other means.

52. Like Starling, another consumer also received unwanted text messages from Defendants' same captive agent, and made a complaint, stating, "Stop sending me spam texts. Not appreciated. Grow your business like a respectable person."

## DIRECT AND VICARIOUS LIABILITY

53. Without the benefit of discovery, and because Defendants disclosed their identity in the telemarketing calls and text messages at issue, Starling assumes Defendants directly sent the text messages at issue.

54. However, if some or all the text messages or calls were made by third-party/parties on behalf of Defendants, in the alternative, Defendants are vicariously liable for those text messages.

55. On May 9, 2013, the FCC determined that telemarketers like Defendants could not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 F.C.C. Rcd. 6574 at 6588 (May 9, 2013) (internal citations omitted).

56. Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id*. at 6587 n. 107.

57. The evidence of circumstances pointing to apparent authority on behalf

of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593.

58. If Defendants directly sent the text messages at issue to Starling and the putative class members, Defendants are directly liable for the sending of those text messages.

59. However, Defendants may have hired, encouraged, permitted, and enjoyed the benefits of mass telemarketing by third-party telemarketers.

60. If Defendants did not directly send the text messages to Starling and the putative class members, Defendants' third-party telemarketers had actual and/or apparent authority to act on behalf of Defendants.

61. Likewise, Defendants also ratified their agents' violations of the TCPA by accepting insurance premiums from sales imitated by unlawful telemarketing communications.

62. Defendants controlled or had the right to control the marketing activities of those acting on its behalf.

63. Defendants acted as principals to telemarketing agent(s) who were acting on their behalf.

64. Defendants are not permitted under the law to outsource and contract their way out of liability by directing and benefitting from their captive agents' TCPA violations.

65. For the count identified below, if Defendants directly sent the text messages and/or calls at issue to Starling and the putative class members, they are directly liable. Alternatively, to the extent any text messages and/or calls were sent/placed by a third-party agent(s) acting on Defendants' behalf, Defendants are vicariously liable for those unlawful communications.

## **CLASS ALLEGATIONS**

66. Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3),

Plaintiff brings this lawsuit as a class action on behalf of herself and all others similarly situated. This action satisfies the requirements of Rule 23.

67. Starling seeks to represent the following class (the "Class"):

For the four-year period prior to the filing of this lawsuit to the date of Class certification, all persons:

(1) who received two or more calls or text messages during a 12-month period in connection with the marketing of Farmers' products or services;

(2) whose number was registered on the Do Not Call Registry for more than 30 days at the time the calls were received; and

(3) whose number is registered to an individual and not a business.

The class is limited to calls or texts placed by or on behalf of Todd Henderson Insurance Agency, Inc and/or R. Todd Henderson.

68. Starling reserves the right to add administrative subclasses, or to amend the definition of the proposed Class, as this lawsuit proceeds.

69. The members of the proposed Class are so numerous that joinder of all members is impracticable. Starling reasonably believes that hundreds or thousands of people have been harmed by Defendants' actions. The phone numbers of the members of the proposed Class are readily identifiable through records available to Defendants or those acting on their behalf.

70. Most members of the proposed Class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

71. On information and belief, Defendants have called and texted, and continue to call and text, people whose numbers are registered on the DNC List. It is reasonable to expect that Farmers will continue to place such calls and text messages, absent this lawsuit.

72. Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed Class include, but are not limited to:

    a. Whether Defendants' conduct of placing calls and text messages to persons whose phone numbers are registered on the DNC List violates 47 U.S.C. § 227(c);

    b. Whether the text messages and calls were "solicitations," as defined by the TCPA;

    c. Whether Defendants maintained and implemented legally sufficient protocols for obtaining consumer "consent" to place telemarketing calls or send text messages to numbers on the DNC List;

    d. Whether Defendants' conduct violates the rules and regulations implementing the TCPA; and

    e. Whether Plaintiff and the putative Class members are entitled to increased damages for each violation based on the willfulness of Defendants' conduct.

73. Plaintiff's claims are typical of the claims of the proposed Class members because her claims arise from the same practice that gives rise to the claims of the members of the proposed Class and are based on the same legal theories.

74. Starling and her counsel will fairly and adequately protect the interests of the members of the proposed Class. Starling's interests do not conflict with the interests of the proposed Class she seeks to represent and she has retained lawyers who are competent and experienced in class action litigation, TCPA litigation and consumer law.

75. Starling's counsel will vigorously litigate this case as a class action, and she and her counsel are aware of their responsibilities to the putative members of the Class and will discharge those duties accordingly.

76. A class action is superior to all individual lawsuits for this controversy. Joinder of all proposed members of the proposed Class in one action is impracticable, if not impossible, and prosecuting hundreds or thousands of individual actions is not feasible. The size of individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most members of the proposed Class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed Class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

77. In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

78. Questions of law and fact, particularly the propriety of placing text messages and calls to phone numbers on the DNC List, predominate over questions affecting only individual members.

79. Defendants have acted or refused to act on grounds that apply generally to the Class, making final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

## COUNT I
**Violations of the Telephone Consumer Protection Act**
**47 U.S.C. § 227(c), *et seq.* (National DNC List Violations)**

80. Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

81. The TCPA provides that it is a violation of the law for a person whose phone number is registered on the DNC List to receive more than one call on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

82. The penalty for each call placed in violation of the TCPA's restrictions

on calling phone numbers registered on the DNC List is up to $500 per call and up to $1,500 per call if the violation is determined to be willful. *See* 47 U.S.C. § 227(c)(5).

83. In addition, the TCPA allows this Court to enjoin Defendants' violations of the TCPA's regulations prohibiting calls to phone numbers registered on the DNC List. *See* 47 U.S.C. §§ 227(c)(5)(A).

84. By placing calls and texts to Starling and the putative Class members' phone numbers, which were registered on the DNC List, Defendants violated the TCPA, including, but not limited to, 47 U.S.C. §§ 227(c)(1) and the TCPA's corresponding regulations.

85. Defendants and/or those acting on their behalf knew, or should have known, that Starling's and the putative Class members' phone numbers were registered on the DNC List.

86. Defendants and/or those acting on their behalf willfully violated the TCPA when placing the text messages and calls to Starling's and the putative Class members' phones.

87. Starling and the putative Class members are entitled to damages of up to $500 per violation for each call made by Defendants and/or those acting on their behalf that the Court finds violates the TCPA and up to $1,500 per violation if the Court finds that Defendants and/or those acting on their behalf willfully violated the TCPA.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff, individually, and on behalf of all others similarly situated, requests that the Court:

a. Enter an order pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying the proposed Class, appointing Plaintiff as the Class representative, and appointing Starling's counsel as class counsel;

b. Enter judgment in favor of Plaintiff and the Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including

injunctive relief, statutory damages of up to $500 per violation, and up to $1,500 per violation if Defendants willfully violated the TCPA;

      c.    Enter a judgment in favor of Plaintiff and the Class that enjoins Defendants from violating the TCPA's provisions and regulations;

      d.    Enter judgment in favor of Plaintiff and the Class for all applicable pre-judgment and post-judgment interest amounts;

      e.    Enter judgment in favor of Plaintiff and the Class for all costs; and

      f.    Award Plaintiff and the Class members such further and other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff demands a jury trial.

Dated: October 8, 2024

Respectfully submitted,

MILLER SHAH LLP

*/s/James C. Shah*
James C. Shah (SBN 260435)
Email: jcshah@millershah.com
Kolin C. Tang (SBN 279834)
Email: kctang@millershah.com
19712 MacArthur Blvd., Suite 222
Irvine, California 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367

BUTSCH ROBERTS & ASSOCIATES LLC

*/s/Christopher E. Roberts*
Christopher E. Roberts (phv forthcoming)
Email: CRoberts@butschroberts.com
7777 Bonhomme Avenue, Suite 1300
Clayton, Missouri 63105
Telephone: (314) 863-5700

THE WEITZ FIRM, LLC

<u>/s/Max S. Morgan</u>
Max S. Morgan (phv forthcoming)
Email: max.morgan@theweitzfirm.com
1515 Market Street #1100
Philadelphia, PA 19102
Telephone: (267) 587-6240

*Attorneys for Plaintiff*